Mr. Gallagher. Mr. Chief Justice, and may it please the Court, the issue before the Court today is whether Secret Service agents who are prepared to take a bullet for the Vice President must also be prepared to take a retaliatory arrest lawsuit, even when they have probable cause to make an arrest. Respondent in this case seeks personal money damages against two U.S. Secret Service agents who arrested the Vice President in the United States who arrested him, allegedly with a retaliatory motive, after he lied to them about whether he touched Vice President Cheney. Kennedy There's just a little bit of noise in the courtroom, and I have a little bit of difficulty hearing your very opening statement. Mr. Hallward Sure. Respondent in this case seeks personal money damages against three — against two U.S. Secret Service agents who arrested him, allegedly with a retaliatory motive, after he lied to them about whether he touched Vice President Cheney. There are three reasons why these agents should not be held personally liable. First, the absence of probable cause should be a required element of a retaliatory arrest claim. Thus, this Court is called upon to answer the question that it left open in Hartman v. Moore. Second, U.S. Secret Service agents acting in their protective capacity should be entitled to a qualified immunity when they make an arrest with probable cause. Indeed, to view it any other way would be to subject Secret Service agents to the potential of retaliatory arrest claims based upon a mere allegation of retaliatory animus, something this Court has steadfastly refused to do, and for good reason, because retaliatory animus is easy to allege and hard to disprove. And third, regardless of whether this Court decides to extend the Hartman rule, the law in 2006 at the time of the arrest was not clearly established. That's entitling the agents to qualified immunity. We don't understand. What was the probable cause? What was the probable cause of the arrest? Look, Justice Ginsburg, the Tenth Circuit found that the probable cause that under underlied its opinion was a 1001 violation, lying to a sex offender. Explain that to me. That's a false statement to a government officer. But that's not the reason, 1001 wasn't the reason that these officers had to arrest. They — there was a question of assaulting the Vice President, and I think that the charge that eventually was made in the State court was harassment. So there's no indication that these — these officers had 1001 anywhere in their minds. Well, two points, Justice Ginsburg. First of all, under Devenpeck, officers are not required to give all of the reasons behind an arrest. But second, and I think perhaps more importantly in this case, when Agent Reichel contacted Mr. Howards and made the arrest, Mr. Howards had lied to him. That was relevant to a Secret Service agent's assessment of the risk of the situation. Do they have to give the — at least for when you stop a car, the test is whether there was probable cause, not whether that was the reason that the officer stopped the car. If there was a broken taillight, there existed probable cause, whether that was the basis on which he acted or not. Now, is it any different when — I don't think it's any different. With respect to an arrest? With respect to an arrest. This is — this is the case. So long as there was good reason for an arrest, it doesn't matter. Absolutely. That's an objective. We've never held that in respect to a claim that the real reason the police arrested was retaliation against, for example, a picket sign having an unpopular point of view or a statement having an unpopular point of view. That is, this Court's never held that it overcomes an arrest where there's a claim of retaliatory First Amendment action. Is that right? That's right. And what you're saying is your first reason is that we should say that. And the question I wanted to ask you there is you make a very strong case where the President and Vice President are involved and need to protect them. But the rule that you there adopt is a rule that will apply to every police officer, anyone who arrests anyone anywhere in the country. And no matter how clear it is that the motive was retaliation against a point of view, that individual will be protected from a Bivens action. So it sounds as if your first claim, the remedy sweeps well beyond the need that you sketched. And so I'd like to response to that. Justice Breyer, I think it has to do with the determination in the Tenth Circuit and the fact that the Tenth Circuit's decision to extend Devon Peck to these facts was not the subject of a cross-appeal. So the issue that you posit is not an issue that's before the Court. It was not a cross-appeal. I understand that. I'm just saying, if I agree with you on your first, that if there is probable cause for an arrest, then wouldn't I have to say there is no retaliatory First Amendment claim when a border officer chases into Arizona a person with whom he politically disagrees, and there are 14 bishops who will say he cared about nothing but his political disagreement. And there's nothing to the contrary. And he says, oh, I happened to notice at trial that when he left, he reached out and snatched a $5 bill that was in the till, and so I had probable cause to arrest him. End of case. Now, that sounds very far-reaching, and I don't know that I'm prepared to do that. So therefore, is there another way you might win your case, or should I do that? Well, let me answer both of those questions. What you've outlined is essentially footnote 10 from the Hartman case. That's the footnote that says, what do you do if the person that initiated the prosecution says, I did it for a retaliatory reason? And the Court sidestepped that. Yes. And of course, Hartman dealt with prosecutions. But people all the time don't arrest others. Policemen frequently don't arrest people for everything they might arrest them for. I mean, jaywalking, to take an example, are all kinds of things where they just normally don't arrest somebody. You might, or I'm sure you didn't, but I might sometimes have driven 60 miles an hour in a 55-mile zone. And I shouldn't even admit this. I hope I get away with it. But you see, it's different arrests and prosecutions. Well, I — certainly it's different, but the Devon Peck statute — Is it different? You acknowledge that prosecutors always prosecute? That they never exercise discretion and say, oh, what the heck, you know? Certainly, Your Honor. All the time, all the time. I don't know that it's any less frequent than an officer deciding not to arrest. In Justice Breyer, I think that the difficulty with your hypothetical is, especially with regard to Secret Service agents who perform, when they're engaging in their protective functions, they're essentially in the public sphere. That's exactly what Justice Breyer is saying, okay, which is, as I understand it, and there's some literature that talks about should we be treating misdemeanor arrests different than felony arrests, because there's less discretion that an officer would have with respect to arresting someone for a felony, than for misdemeanors or criminal fines, because, like jaywalking, policemen don't arrest you for jaywalking unless they're either on a ticket binge or because there's something about you that they don't like. Sure. So if that's something about you they don't like, is that you're wearing an anti-war armband, are we going to let that plaintiff not recover? Because somehow we need to protect police officers so much in the discretionary use of this vast power they have to arrest that we're going to permit them to trample the First Amendment, essentially. Or are we going to say, in the normal situation, there is a First Amendment claim, even with probable cause, if you can prove that it's a motivating factor for the arrest, but we treat Secret Service differently? And I think that was the point Justice Breyer is getting to and the one I'm most interested in. If we don't extend Hartman, how do we, in a principled way, deal with the unique needs of the Secret Service? Let me briefly address the first half of the question, then I'll address the second half. The first half, when Justice Sotomayor, when you suggest that police officers could trample on the First Amendment, it's important to remember we still have probable cause as the principle. If you're jaywalking, there's probable cause. But probable cause is the Fourth Amendment standards specified by the framers of the Constitution. But what does it have to do with violating the First Amendment? Meaning, if police officers have discretion and they would not otherwise arrest you, except for their dislike of your speech, that's a violation of your right to free speech, isn't it? Well, I'm not sure that that's exactly the case. Again, it gets back to this footnote 10 in Hartman, which Hartman can be read two different ways. It can be read as saying that the elements of the constitutional tort itself require the absence of probable cause, or it can be read as saying the elements of the cause of action. But let me address the second question. Sotomayor, we can go to that question later. And the second question has to do with Secret Service agents, because Secret Service agents, unlike police officers performing law enforcement functions, when Secret Service agents are acting in a protective capacity, they're protecting our nation's leaders, and they are doing so in a very public way. And they are also doing so in a way that is essentially a free speech zone. Virtually everyone that a Secret Service agent encounters when he's protecting the President and the Vice President can allege that they're engaged in free speech. So for Secret Service agents in particular, they can legitimately evaluate what someone is saying in order to determine a particular threat level. And because of that, Secret Service agents have a similar sort of complexity of causation to the situation addressed in the Hartman case. Now, in Hartman, clearly it was a one — it was a two-individual causation situation. But with regard to Secret Service agents, the causation is similarly complex, because Secret Service agents can legitimately take into account what someone is saying in order to determine a threat level. Regardless of whether the Court decides to extend the Hartman case, it's absolutely clear that the law in 2006, in June of 2006, when the agents made this arrest, was not clearly established. The Hartman case was handed down in early 2006. It had only been on the books about three months when the arrest was made. For that reason, Secret Service agents should be entitled to a qualified immunity in this case because the law was not clearly established. With regard to this — the formulation of qualified immunity that we are asking for, we believe that it's important for Secret Service agents acting in this protected capacity to have the requisite breathing room in order to make decisions in life or death or imminent threat situations. In fact, the qualified immunity that we're advocating is particularly important at the margins, particularly important in situations where it's not clear what a Secret Service agent can do or should do, where a Secret Service agent has to make a snap decision in order to determine whether someone is a threat and then act appropriately. The Court in the Atwater case noted that the object of the Court's cases has been to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and even years after the arrest are made. You're not suggesting absolute immunity? No. We're suggesting a qualified immunity. But it's a different kind of qualified immunity? It's certainly different from the Harlow type of qualified immunity. It is an immunity that is contingent upon having — contingent upon the Secret Service agent's decision to make the arrest. But certainly once the immunity attaches, it would be — it would be full immunity from reclaim. The Court noted earlier this term in the Ryburn v. Huff case that judges should be cautious about second-guessing a police officer's assessment made on the scene of the danger presented by a particular situation. We think that this case aptly demonstrates a situation in which Secret Service agents made very difficult decisions on the spot, and they should not be second-guessed by the Court. Finally, with regard to the — whether qualified immunity is — was clearly established in June of 2006, the Ninth Circuit, the primary case relied upon by the Tenth Circuit was the Skoug case. The Skoug case was the case that the Tenth Circuit relied upon in holding that Hartman should not be extended. It's important, though, when you review the Skoug case, to — to read the entire case, because the Skoug court, after concluding that — that Hartman should not be extended, still proceeded with the qualified immunity analysis to determine whether the law was clearly established at the time of the incident. And what the Skoug case concluded was it looked at — it looked at the nature of the right. And we're — you know, we know from the Anderson v. Creighton case that this Court has said it's important when focusing on constitutional rights not to look at the 30,000-foot level, not to look at the — at the — at the high level, but to look at the — at the contours of the right. And that's what the Skoug case did. Roberts. Thank you, counsel. All right. Thank you. Mr. Srinivasan. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to start off addressing the Secret Service in particular, because that's the principal focus, although I take the point that there are questions about applying the rule in a broader context. But I think understanding why the rule makes sense in the context of Secret Service agents and law enforcement officers who are performing similar protective functions would help inform why it makes sense to broaden the rule as well. With the Secret Service, I'll pick up on the point the Petitioner's counsel was making, which is that it's legitimate in this context for Secret Service agents to take into account expressive activity in determining whether the circumstances warrant a discretionary exercise of the power to arrest. I assume you would include U.S. Marshals if they're agents. Yes. So you're talking about protective details. That's correct. And that's why I wouldn't limit it to Secret Service in particular. I think what happens in a lot of these contexts is that it's natural for these individuals to encounter First Amendment activity by the public, and it's legitimate for them to react to First Amendment activity in deciding whether the circumstances warrant an arrest. And the problem arises because it's very difficult to distinguish between, on one hand, a legitimate consideration of expressive activity as evidencing the sort of threat that warrants a response, from an illegitimate consideration of expressive activity born of a motive to suppress it. Does your rule apply regardless of the degree of animus that the agent is alleged to have had as to the particular view being expressed? I think it would, Justice Kennedy, because we would have an across-the-board, no probable cause requirement of the kind that the Court applied in the retaliatory prosecution context in Hartman. Now, I think your — the question of the degree of animus asserted by the agent on the scene is exactly why these are complicated factual questions. Those kinds of allegations can be made, and then you're going to have a trial where the agent's on the stand, and the jury is going to have a very difficult time, and the agent is going to have a difficult time explaining why it is that he acted legitimately based on expressive activity, because he felt that there was a threat to the person he was trying to protect, as opposed to explaining that he didn't act in order to suppress the viewpoint that was being asserted. These kinds of allegations can often be made, and in fact, they can even be manufactured at the scene by an intelligent person who is going to be the subject of an arrest. And I think that complicated question of causation is exactly why it makes sense to apply in this context the same objective screen in the form of a no probable  Scalia. Scalia. Why is there any difference if — when ordinary policemen are policing an authorized demonstration in front of this Court, or anywhere, for that matter, the people making the demonstration have the same motivation and can make the same assertion of, oh, the only reason you arrested me was because you didn't like what I was — what I was talking about. So why should that situation be different? That's correct, Justice Scalia, and that was going to be my next point. Once we understand why it is that it makes sense to apply this rule in the context of officers who engage in the sort of critical public protective functions of the Secret Service, I think we understand why it also makes sense to apply it in other situations, because law enforcement can legitimately take into account expressive activity when they're engaged in functions such as crowd control. And in those contexts as well, it's going to be difficult to disaggregate the legitimate consideration of expressive activity as evidencing a threat from an illegitimate desire to suppress a viewpoint. Breyer. Look, you just used the word crowd control, and I take it in saying the word crowd control, you are making a distinction. I'm making a distinction. Do you want the same rule of automatic, you know, immunity — sort of automatic immunity where crowd control isn't at issue, where there's a history of persecution of an individual by a particular officer, da, da, da. I mean, you know we can make up cases. Do you want it absolutely across the board, or are you going to start making distinctions? I would not draw distinctions, Justice Breyer. Of course there's going to be factual situations. I mean, I agree with you about the crowd control. I see that. I see that problem. I see the problem of protecting people in public life. I see the problem of protecting the President. How far — but now, given that that's a particular problem where views are likely to be evidentiary. Unpopular views actually are, unfortunately. But how far do you extend it? You say extend it to everything, to jaywalking, to persecutions, to, you know, that's what's making me a little nervous. Right. And I can understand the basis for the nervousness. I guess the question for the Court is whether the benefits of having an administrable across-the-board rule outweigh the costs of trying to forge some sort of exceptions to deal with extreme hypotheticals. And — Sotomayor, do you have a sense of how many of these First Amendment retaliatory claims in those jurisdictions that permit them? I know they're more limited. How many of these cases arise? We do. We've done an unscientific search, but to use the same time frame of reference that the Court used in Hartman, which is looking back 25 years, if you do a sort of standard Westlaw search, what you'll see is there's roughly 100 court of appeals cases and 450 or so district court cases. And how many arrests are there a year? I don't know. Let's make 9 non-felony. I'm sure it's in the millions. It's — I'm sure there are scores and scores of arrests. That's correct. And of course, all we're talking about is the cases that get to the point where you have an opinion that can be found. And there's the obvious point that depending on what the Court does here, you may see a proliferation of those claims, and we certainly hope that wouldn't be the case. But I think on the question of whether it makes sense to have an across-the-board rule, I guess I would echo what Petitioner's counsel was suggesting, which is you can have the same set of considerations in the retaliatory prosecution context because prosecutors do act with, by hypothesis, with illicit motives in some situations. And the Court considered whether the benefits of having an across-the-board rule outweigh the costs of forging an exception to deal with extreme circumstances. And what the Court said was we want to have a rule that's designed to deal with a mine run of cases. We don't want to have a rule that has an exceptional circumstances exception because, at that point, there will be a great deal of litigation concerning what cases fit within the exception and what cases don't. And what the Court said was that's rather like designing a retirement plan to deal with the possibility that someone might win the lottery. That's in footnote 10 of Hartman. And I think similar considerations would weigh counsel in favor of applying an across-the-board objective, no probable cause screen in this context as well. And I think it's important to understand that this is a case that's going to be a litigation decision. Ginsburg-Miller. Well, Justice Souter gave two specific reasons, and neither of which apply in this context. It's the prosecutor who institutes the charges, but the suit is not against the prosecutor who would be absolutely immune. So that is not in this picture. Here we have one officer. So it would certainly be an extension of Hartman, because the reason that Hartman gave for the rule was tied to — very much tied to prosecution rather than arrest. Well, with respect, Justice Ginsburg, I think this case is of a piece with Hartman in two relevant respects. Your Honor is quite correct that Justice Souter's opinion focused on the fact that you have two individuals in play. You can have that situation here, but we don't base it on that. What the opinion was getting to was that that creates complex issues of causation in the prosecution context. And I think it was the complex causation that really drove the need to have an objective across-the-board rule. You have the same kind of complex causation problem here for the reasons that I've explained, which is that it's extremely difficult to disentangle a legitimate desire to act against — to suppress a danger of which speech is evidence from an illegitimate — illegitimate desire to suppress a viewpoint. Kennedy, you might have had this in your mind. So is the same immunity for selective enforcement based on race? The same immunity? Yes. No. The — the — I think the Course decision in Wren, for example, supposes that even though you have probable cause, you could have an equal protection claim if the proof could be made. And this is very important. In the equal protection context, including for race, there is a different objective screen in place, and it's a stringent objective screen that this Court announced in Armstrong, which is the — I'm — I'm aware of the reservation in Wren. Why should there be a difference in Fourteenth Amendment equal protection and First Amendment speech? Well, I think part — part of the reason is this, that in — in — with the First Amendment, expressive activity can legitimately be taken into account precisely because it can manifest a danger, whereas with race, in the ordinary case, I think the reason why we have these principles in the race context is it's ordinarily not a relevant consideration. And the Armstrong rule is designed to distinguish between circumstances in which race was the motivation and in which race wasn't the motivation. And it serves that purpose well. But it doesn't work so well in this context, because here First Amendment activity can legitimately be taken into account. When, as in this case, a Secret Service agent overhears an individual say that he's going to ask the Vice President how many babies he's killed, it makes all the sense in the world for the Secret Service to focus their attention on that person. Scalia, you want to extend it to crowd control as well, what difference does First Amendment make there? Well, I think it's the — the nature, intensity, and vehemence with which the First Amendment activity is being engaged in can inform an officer on whether the circumstances present the kind of danger that warrants a law enforcement response. So I — and when a law enforcement officer does that, he's going to be subject to potential liability if an individual says, look, you weren't reacting against me because of the way I was expressing my views, you were reacting against me because you disagree with my views and you wanted to suppress them. And that's a very hard thing to disentangle, and it not only has that problem at the back end, but it results in a problem at the front end as well. Because what happens at the front end is that officers at the very outer margins might have in the back of their mind a concern that if they acted based on their best intuitions about what kind of law enforcement response is warranted, they might later be subject to suit based on a mistaken assumption and potentially an ability to convince a jury that they were acting based on an illegitimate desire to suppress a viewpoint rather than on a legitimate desire. Breyer. How many cases — you might know this, you might have information on how many cases over 5 years or whatever period there actually have been against Federal protective officials of retaliatory First Amendment activity? I don't know. It would be in the department, wouldn't it? Do they keep track? It's potentially there, but I just don't have the answer at my disposal, Justice Breyer. Do we know that this is not unique, the one before us? Well, these — certainly we know that these kinds of interactions arise with some frequency. I think there was some publicity surrounding the — But when you looked up your research for this, did you find any other case in which anyone had ever asserted a First Amendment claim of retaliation for an arrest? Against a Federal protective official. No. I — candidly, I didn't — we didn't conduct a search with that object in mind. So I can't give you an answer one way or the other. I did want to make one additional point, Justice Ginsburg, in response to the question you posed about the applicability of Hartman, which is that at one level it applied — the rule should apply because the same concern with complex causation is at issue here as well. But the other way to think about the applicability of Hartman is to put these cases on a spectrum. On one end, you have what the Court in Hartman identified as a standard retaliation case, of which the Court identified public employment as the archetypal example. And on the other end, you have retaliatory prosecution, where the Court thought that there were sufficient concerns about complicated causation, that it made sense to have an across-the-board objective rule. Now, the question could be, where does retaliatory arrest fit within that spectrum? Is it on the retaliatory prosecution side or is it on the public employment side? And for a couple of reasons, I think it fits decidedly within the retaliatory prosecution side. One is the one I've given, which is that speech can legitimately be taken into account and so it creates complex causation. But the other one is, in some sense, the flip side of that, which is that in the public employment context, the standard fact pattern is going to involve a long-term relationship between an employer and an employee, during which time there's been no adverse action. The employee then engages in some sort of aggressive activity, in the aftermath of which the employer undertakes some adverse action, such as a termination. Now, in that context, it makes sense to infer that there may well be an illegitimate speech-suppressive motivation at work, because you have, in some sense, a control period in the interactions between the employer and the employee that predated the expressive activity. That's not the case when you're dealing with law enforcement. In the law enforcement context in the main, this is a one-time interaction between an officer and a suspect, the arrestee. You don't have the prior relationship that acts as a control, and so you have to ask the question whether, based on that one-time relationship, is there a basis for inferring that a speech-suppressive motivation was at work. And here, because it can be legitimate for an officer to take into account speech in deciding whether the situation is the kind of one in which a law enforcement response is warranted, it makes sense, unlike in the public employment context, to apply the same objective across the board screen in the form of a no probable cause requirement. Ginsburg. May I go back to the probable cause, the question I asked before? Not like the taillight, when 1001 came up in court, this situation may well have warranted probable cause for assault, probable cause for harassment. But when did the 1001 was not the one in no one's mind. That seemed quite strange. It was not, Your Honor. Of course, that's exactly what happens in the Fourth Amendment context. That was the issue before the Court in Devenpeck. And the Court explained in Devenpeck why it makes sense to have an objective probable cause inquiry rather than a subjective. Ginsburg. So it doesn't matter that it's something that comes up only in court. It's not something that, I mean, why wasn't the natural, what one would expect, probable cause to arrest because it was an assault or harassment, the actual charges that were made? I don't know the reason that a harassed – I don't know the precise contours of the harassment charge in State court that were made. I think that they mapped on in some measure to the assault, the assault that was suspected by Officer Reichel, who affected the arrest. Now, I think the concern with importing some sort of subjective probable cause dimension into the inquiry, if you asked, you know, what offense did the officer in fact have in mind, it's the same concerns that drove the Court to apply an objective rule in Devenpeck, including, for example, that you would have disuniformity in that similarly situated individual to be treated differently based purely on what happens to have been in an officer's mind. Thank you. Roberts. Thank you, counsel. Mr. Lane. Thank you, Mr. Chief Justice, and may it please the Court. I think what we have here is a solution being offered by the government, and now we have to go find the problem. And I think that's what Justice Breyer's question was directed at here. I have done not a scientific search, but I can take credit for a little bit of science involved in determining how many such cases arise. And at page 13 of our brief, we cite in footnote 8 that a search with no time limitations whatsoever, going back in Lexis with the words Bivens or 1983 retaliatory arrest, not with no time limitations whatsoever. So we have a solution, but we really don't have a problem. The only Secret Service case that this Court has ever heard that I'm aware of involving anything remotely like this is Hunter v. Bryant. So this is not a significant problem. This also factually is probably not the best case for them to be making their argument that we need some sort of special rules that apply to the Secret Service, given the facts of this case where Mr. Howards, by all accounts, walked over to the Vice President, looked at him and said, I just want you to know I think your policies in Iraq are disgusting. There is a dispute at that point whether he gently patted him on the arm, not a crime, or tapped him on the shoulder, again, not a crime, or — There's no — It's an assault, isn't it? I'm sorry? All it takes for an assault is an unwanted touching. Well, incidental contact is not an assault. It's not incidental if you reach out and touch somebody on the shoulder or the arm. Well, the problem is that the Vice President was on the mall having contact with numerous people, shaking their hands, letting them pat him on the back, telling him what a great job he's doing. He was on the line, and he didn't — he doubtless didn't consider those contacts hostile. But when somebody tells you, I think your policies are disgusting, I mean, just don't tell me that it's — it's not a crime. It is an assault if it's an unwanted touching. Well, under Colorado law, he was charged with harassment. Well, what you've described is not when the person was arrested, right? That's right. The person was arrested later when approached by the Secret Service agent, lied about whether he touched the Vice President. At that time, in a nonprotected area, was carrying a bag, right? Correct. And wandering around, it turns out, because he was looking for his son. But if you're the Secret Service agent, you see somebody who said, your policies are disgusting, that person touches the Vice President, he lies to you, he comes back, he's carrying a bag, and he's wandering around, do you think it's reasonable at that — well, I guess you don't — to — To arrest the person? That's a multifaceted question. I'll try my best to cut right to it. The reason it's multifaceted is because I'm trying to capture what might have been going through the Secret Service agent's mind at the time. Well, that's — that is part of the point I have to make here, all right? In this Court's jurisprudence on Fourth Amendment issues, what is going on in the agent's mind is irrelevant. The issue is — Well, what would be going on in a reasonable Secret Service agent's mind at that time? First level of inquiry, was there a Fourth Amendment violation? No, according to the Tenth Circuit. We then have got to shift gears if we're going to do a First Amendment analysis, and is this a retaliatory arrest or not? We have got to look into the subjective mind of the agent. That's where Justice Ginsburg's questions, I think, take on great import for this discussion, because, as she correctly pointed out, the agents on scene never said in deposition, they have never claimed anywhere, that they arrested Mr. Howards on a 1001 violation. The agents on scene in deposition said, we arrested him because of the way he approached the Vice President, not a crime, and his demeanor. We thought it might be an assault. That later morphed into a State charge of harassment. Nobody ever said 1001 formed any basis for a torture. And also, you have left out that one of the agents overheard him say he was going to ask the Vice President how many babies he killed that day. Right. Okay. So their job is to protect the State President. Absolutely. That's their job. Correct. And it's a very emotional subject. Absolutely. And if something happens to the President, nobody is going to say, oh, you know, what were you doing? And the whole country is in mourning. Correct. We understand that. And therefore, it's a matter of concern that if you have a rule of law that says to the agents, when you hear someone who says, how many babies are you going to kill that day, I'm going to ask the Vice President, I'm going to touch him, I am going to then tell them a lie when they ask me if I touched him, that's cause for concern. Absolutely. Okay. Now, if there's a lawsuit, the agency will say we just can't do it. We can't do it. We can't use that as a basis for stopping that individual. Well, now All that poses a problem. Now, you're and I think I recognize it as a problem. I'm not saying I have the solution. Well, I think you hit on the solution as part of the problem you just expressed. And that is, can they stop this individual? And the answer is absolutely yes. They have every arrow in their quiver under Terry versus Ohio. They can stop him if they perceive a threat. They can force him to open up his opaque bag. They can force him to show them what's in the box inside the opaque bag. They can pat him down. They can want him with a metal detecting wand. They can assure themselves. And it wouldn't be a violation of the First Amendment if they only did that because they didn't like the ideas he was expressing? They are allowed. Wouldn't that be a violation of the First Amendment? They are allowed to take reasonable steps under Terry, under every conceivable case that this Court's ever decided. Even though they're doing it for they do it for a racial reason? Would that be okay? No. No. What I'm saying. Of course not. I don't see how your First Amendment exception doesn't apply to those things as well as to the arrest. It would. If he could prove that they did a Terry stop on him in retaliation for his free speech and it was motivated, and I know this, Your Honor's feelings about intent-motivated constitutional torts. But if he could prove that the Terry stop was motivated by, in an effort to punish him for his free speech, yes, that would be a cause of action as well. But. Roberts. So what you have under your theory, a person should put on his car a bumper sticker that says, I hate the police, and that every time they're pulled over, they will have certainly a plausible case is you violated my First Amendment rights. It's not because I was going 60 miles an hour. It's because of my bumper sticker. And the police officer at that point, he says, you know, I can't give a ticket to this guy without being hauled into court on personal liability, because he's got a credible case that it was for First Amendment grounds. Well, I think we can look at the, as I've said, the arrows in the quiver of the court to weed out those kinds of cases. No, no. You've already got the officer in court. I mean, you get a speeding ticket, and most times they don't show up because they've got other things to do. Now he's got to show up in district court, in State court to defend against this. Well, I mean, litigious plaintiffs are a consistent problem across the board under many contexts. And there's really, you know, there's almost nothing that can be done. This Court has taken steps to cut back prison litigation that's frivolous, things of that nature. But, yes, if the heightened pleading standard this Court enunciated in Iqbal, you can't just come up with conclusory allegations. You can have facts in support that that's why they stopped me, because of my bumper sticker. Is that a case that you could state? He pulled me over, he gave me a speeding ticket, but the only reason he picked me out is because I had a bumper sticker saying I hate the police. Well. Does that go to trial? No. That doesn't necessarily go to trial. But that's a conclusion. Why doesn't it go to trial, and what does it go? I mean, do you get to depose the police officer? Why did you stop him? Did you stop anybody else for going 65 miles an hour that day? Well, I mean, these evidentiary questions have to be, first of all, supported in a pleading with heightened scrutiny under Iqbal. Conclusions are not simply enough. You have. It's not a conclusion. I mean, if he didn't have the bumper sticker and you assert in the pleading he stopped me because he knows I hate the police, that's a conclusion. But if you have the bumper sticker, he says, you know, I had the bumper sticker and that's why he stopped me. Well, let me give the flip side of that and say, if the police officer did stop him because of the bumper sticker, he should go to trial. He should be held accountable. So the only way you can find out is you put in the evidence, here's the bumper sticker, and you put the police officer on the stand. Well. You say, why did you do it? Under the. And all of a sudden, I don't know why everybody doesn't have the bumper sticker. Theoretically, every single person who's ever been arrested for any crime could raise a First Amendment retaliation lawsuit. Every convicted murderer doing time throughout this country could do that. They don't, however. There is not a rush to the courthouse of retaliatory arrest claims because the pleading requirements are heightened. Qualified immunity for over 100 years has protected the Secret Service. They've been protecting. I'll say, though, that in the case of the President, what you're hearing, as you well know, that the combination of disparate political views and risk is unlike other situations. And I don't know if they can prove it, or you could prove the contrary, but that's a claim, and I can't say there's nothing to it. So let me suggest to you another arrow, which I'll ask you, what do you think of this arrow, and the answer is going to be not much. But I'm interested in hearing your reason. In Hartman, Justice Ginsburg and I dissent. And we referred to a D.C. Circuit case. And in the D.C. Circuit, it talked about rare cases where strong motive evidence combines with weak probable cause to support a finding that the prosecution would not have occurred but for the animus. So far, I think fine. But suppose you were to say because of the factors that have just been mentioned were the President at stake, the courts will ‑‑ or his life is at stake, the President's ‑‑ the courts will not infer once probable cause exists that it's weak. And the courts will not infer from the simple presence of political disagreement that the motive of retaliation is strong, which in fact would produce a very limited extension of Hartman to the case of protecting the President of the United States. And now, I know you're not going to agree with that, and I'm trying it out, and I'm not saying I agree with it, but I want to see how you react. Well, let's take a look at the facts of this case. The Tenth Circuit found there was probable cause for a 1001 violation. But was there probable cause ‑‑ is there a great body of circumstantial evidence surrounding this case that would point to probable cause, which should be considered in deciding how this case proceeds? We have the agent in charge of the protective detail, Agent Lee, standing 8 inches away from Vice President Cheney when this entire encounter occurs. Agent Lee testified. He saw no crime committed. We had numerous agents. Yes, Your Honor. Sotomayor, let's go past that for a second. What was it that the arresting agent said or did that showed the animus? Meaning, because that another officer actually saw it and understood himself what he thought, it doesn't mean that this agent, who was told that there had been a touching, had that information. So I know collective knowledge is a theory in a lot of cases. But let's deal with the facts of this case. What's the animus? Well, there were discrete First Amendment episodes that occurred in the context of this case. One was testified to by Mr. Howards in his deposition, that when he first of all was approached by Agent Reichel, Agent Reichel said, I want to talk to you, and flashed his badge. And Mr. Howards declined the invitation to talk to Agent Reichel. That, according to Mr. Howards, angered Agent Reichel. That is a First Amendment significant event in and of itself. Steve Howards testified that he then was asked by Agent Reichel, we want to talk to you about assaulting the Vice President. And his response was, I didn't assault the Vice President. I merely criticized his policies in Iraq. And if you don't want him criticized publicly, he should stay in his undisclosed location, or words to that effect. Again, Mr. Howards testified that angered Agent Reichel. At that point, the cuffs went on. And I think that is circumstantial evidence in support of the animus for what was going on. Agent Reichel was on notice as to what Howards had said to the Vice President. Sotomayor How does all of that prove your point of animus in light of the undisputed fact that he lied about touching the Vice President? Well, again, lying to the Vice President is what we look at on a Fourth Amendment analysis, because what's in Reichel's actual mind under Devenbeck is irrelevant. So, yes, there was probable cause. But was Reichel himself directing his animus at Mr. Howards and arrested him? We have to look into what was actually in his mind, and that was not in his mind. A 1001 violation was not in his mind. We look at what was in his mind, and we've already said, what was in his mind is he approached the Vice President, he criticized him publicly. You do understand that this case is inviting the questions that Chief Justice asked, and which, as Justice Breyer and some of us are concerned about, which is what your adversary has described as First Amendment voicing is going to be a part of many, many arrests. How do we draw a line outside of the one being proposed by your adversaries that probable cause is the line that doesn't enmesh the police in a constant barrage of claims that just because they angered a police officer, that's why they were arrested? Well, first of all, there has not been this constant barrage. Hartman has only applied until — I mean, this Court decided Hartman in 2006 for retaliatory prosecutions. There has not been a run on the courthouse on retaliatory arrests. Would you acknowledge that the Secret Service faces a different situation from ordinary police officers in conducting their daily activities, in that Secret Service agents may legitimately take into account First Amendment activity by someone who is in the vicinity of the President or the Vice President in assessing the degree of danger the person presents? This may not help my case, but I'll go further than that, and I'll say any police officer has an absolute right to listen to what any protester is saying and consider what is being said in terms of assessing the level of threat that that protester poses. But, as I said, in this case, they had every right to stop Mr. Howards, to do a Terry stop on him, because they were concerned about him. And reasonable cause for concern under Terry is the standard. You don't need probable cause to pat someone down under Terry. It's simply if a reasonable officer would be concerned. Again, I don't understand why you — why you say that they're immune from the charge of First Amendment retaliation for that, but not immune from the charge of First Amendment retaliation. I mean, if you say they're doing it on First Amendment grounds for the one, they're doing it on First Amendment grounds for the other. Why is either one okay? I'm not saying that they're immune on a Terry pat-down if it's done in retaliation for free speech. I'm simply saying that would make it a much more difficult case for any protester to go to a — to go to court and say the only reason he patted me down is in retaliation for my free speech. Okay. So then, putting it in their point of view, I just read what he actually said. He was very angry. You're fine. I mean, judging what he said, there were a lot of swear words and so forth. He was pretty angry at this whole situation. So you're a Secret Service agent and you hear him say, speak like this. He has every right to speak like that. I mean, people do. I understand that. But now he's also thinking that I'm nervous about this. The President is here, the Vice President, whatever, same thing, and I've got to do my job. So — and nobody's going to say, ho, ho, whatever it is if somebody's hurt. I mean, he's also lied about whether he touched the President. And he's also been talking about the President killing people, the Macy's and so forth. And let's see if he's a threat. All right. So what is he supposed to do? He's supposed to, if he has reasonable cause to believe Steve Howard doesn't do this. Well, it is in this situation. But this situation, I'm pretty peripheral. Then he pats him down, he opens the bag. Nothing there. Nothing there. Then they monitor him and they watch him. And that's all. A lot of people in that place. There is no probable cause to believe he's committed a crime at that point. But they didn't know that. That was not in their minds. We're doing a First Amendment analysis and not the Fourth Amendment analysis at this point. First Amendment analysis — But they didn't arrest him until after he lied, right? But it was never in their minds. They testified. That didn't have anything to do. That's the Tenth Circuit's post hoc rationale under Devenpeck, which says if there's any objective probable cause that the Tenth Circuit or this Court or any other court can concoct, post hoc, even though it wasn't in the officer's mind, that's good enough to arrest somebody. That's probable cause, all right? But in First Amendment analysis, it can't be an objective standard. Objective standards are clean, they're nice, they create bright lines. But when we are looking at a First Amendment violation, we have got to be able to get into the subjective intent of the officer at — on the scene. And when you say that, that means that almost all of these cases have to go to trial. No, they don't have to. Before a jury. Well, how are you — how can they be stopped before they go to trial? Because if, first of all, as I've said, Iqbal requires heightened pleading, not just conclusions. We have the summary judgment standard. I engaged in First Amendment — I engaged in First Amendment activity. We have a summary judgment standard where — and in fact in Butts, this Court held that a firm application of the rules of civil procedure will always prevent frivolous claims and meritless litigation from occurring in situations exactly like this. And that's true. A firm application of the rules of civil procedure, a summary judgment standard, which is — Well, summary judgment, that's — you've already been in court for a long time when you're talking about summary judgment. There's no easy way out of this, unfortunately. Frequently, when you're talking about — Well, there is an easy way out of it, we could agree with you. Well, that unfortunately is an easy way out of the First Amendment as well. I mean, this Court has decided some incredibly difficult cases. Snyder v. Phelps, authored by Your Honor, very difficult case. Could it be sidestepped by, you know, somebody steps off a curb and is thereby jaywalking? Are we limiting — I mean, the question is that you seem to have a very black-and-white view of what's going on in the officer's mind. Did you stop — did you arrest him because of retaliation or was it because of legitimate security? And I suspect that the people engaged in this type of thing have intuition. I mean, they don't sit there and say, well, let's see, is it because he said he didn't like the war in Iraq or is it because he's wandering around, looks like he's looking for something with a bag? I mean, I assume they sort of have experience and they calculate all this in and say, I've got to do something. And how do you parse those different motivations? Well, what I say about that is that — and again, I know this is not an answer that you're probably going to like because this means a trial is involved, but this is what juries do on a daily basis throughout this country in every criminal case. What is the subjective intent of the defendant? In every civil case, is this an intentional act, a knowing act, a reckless act, a negligent act? That's what juries do. And if there's enough evidence to get this case to trial, and I would posit that in this case where you have agent after agent after agent who saw the encounter up close and personal with the Vice President and Mr. Howards, none of whom saw any evidence of any criminal activity by Mr. Howards, all of whom let Mr. Howards walk away from the scene, that's good evidence that the — One reason that I, in fact, don't like the answer is because what the agent is now going to have to factor, in addition to the hostility of the views, the touching of the Vice President, the lying about it, the wandering around with the bag, is in the back of his mind, you know, if I'm wrong, I may be held personally liable in damages for taking some action that some jury somewhere is going to say was based on retaliation rather than my obligation to protect the Vice President. Well, I mean, theoretically, yes, that could be a problem. And I am quite certain that certain civil litigants, just as in criminal cases, people are wrongly accused of things that they didn't do, they end up in a trial, and sometimes juries get the wrong results and an injustice occurs. We can't fix all those problems when it's not really a significant problem. There are no run-on-the-courtrooms around the land of these kinds of cases arising. We don't need to have any rules that specifically pertain to the Secret Service when, to my knowledge, this Court has had one Secret Service case in its entire history, and there are 15 appellate-reported Federal decisions regarding retaliatory arrests, period. Which way does — is there a record of retaliatory arrests by Secret Service agents against people who say things that are critical of the President or the Vice President? The only way I know to look for that is on Westlaw or Lexis, and Mr. Srinivasan indicated that they found 100 or 400 cases. We did a search like that. We came up with the same number. We dug down into those cases, and in terms of actual litigated retaliatory arrest cases, we found 15 total. That's not scientific, but that's the best I've got for you at this point. And I don't know if there is a repository of where we can find that or not. But this — and I started this argument by saying this is a solution in search of a problem. The Secret Service has adequately done their jobs beautifully over — for over a century, and there is no reason to put some different rule down on the Secret Service. You lost a couple of Presidents. Well, they're doing the best they can. I mean, that's — I understand that. But it is — it is a serious, serious issue to curtail the First Amendment. Consider the situation where you actually do — and I believe this is that case — you have Secret Service agents who deserve to be taken to a trial because they have gone out of their way to punish someone for their free speech. What do you do about those guys? But it's ambivalent. I mean, suppose it turns out you have this trial. We know what words were spoken. Get to the trial. It turns out Reichle is a strong opponent of the war in Vietnam. Then end of trial, right? You know, that would be a fact to be considered by the jury. I could lose this trial when we go back, if we get a trial. That's what — that's what jury trials are all about, Justice Ginsburg. And I'm not saying that — I have to show evidence to this Court that I'm going to win the trial before I win this case. The issue simply is, can we sacrifice the First Amendment? You know, does a litter bug lose their right to have First Amendment-free speech? Does a jaywalker lose their right to have First Amendment-free speech? Because probable cause exists to believe they've committed some offense, and you'll have officers ostensibly enforcing litter laws and jaywalking laws and blocking-the-sidewalk laws. And First Amendment is essentially evaded. A hundred years of jurisprudence, courageous jurisprudence, many times by this Court, goes by the boards because somebody's a litter bug. I just don't see that as the solution to this problem, and I also don't see that the Secret Service needs some enhanced protection from this Court when this has never been and is not now any kind of a serious problem. The status quo is Mount Healthy. It has worked for decades, and it should continue to work. And if these agents get tagged in this case, maybe they deserve to get tagged in this case because the First Amendment is extremely important. And I don't denigrate the job of law enforcement or these agents in any way. I'm simply saying that when the First Amendment is at stake, I think — and the law has been working just fine throughout decades — to extend the no probable cause in Hartman to on-street encounters where there is no complex causation chain, where the main actor in Hartman was immune completely from lawsuit. The prosecutor in Hartman could not be sued under any circumstances, nor could the prosecutor in Hartman be questioned in deposition under our traditions. We don't question prosecutors in depositions about why they made decisions to go ahead and prosecute. So this Court stepped back in Hartman and said, that's a different story. But on-street encounters — if you extend the no probable cause requirement to on-street encounters, any rogue police officer or Secret Service agent who wants to — can ostensibly enforce any number of legal violations — one mile an hour over the speed limit, you're going to jail allegedly for going one mile an hour over the speed limit or under outwater for not wearing a seat belt — when the real reason is your bumper sticker. If you can prove that, they should go to trial. Absent any further questions, I'll sit down. Thank you very much. Thank you, counsel. The case is submitted.